BEVERLY A. WATSON, personal representative of WILLIAM C. WATSON, Deceased, for the benefit of BEVERLY A. WATSON *et al.*, Plaintiff-Appellant, *v.* LEANDER FISCHBACH, Individually and d/b/a FISCHBACH BAR, *et al.*, Defendants-Appellees.

(No. 71-240;

Second District—June 28, 1972.

John W. Burgess, of Fitzpatrick & Gulbranson, of Chicago, for appellant.

Robert K. Clark, of Rockford, Herbert J. Baker, of Chicago, O'Brien, Burnell, Puckett & Barnett, of Aurora, and Rissman, Jenkins & Klein, of DeKalb, for appellees.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Plaintiff, Beverly A. Watson, filed a dram shop action (Ill. Rev. Stat.

1967, ch. 43, par. 135) on behalf of herself and her daughter against the defendant tavern owners for loss of support by reason of the death of William Watson, plaintiff's husband, in an auto accident on August 9, 1968. Plaintiff appeals from the judgment based upon a verdict of the jury in favor of the defendants.

On August 9, 1968, William Watson, a twenty-five year old construction worker, crashed into a utility pole some 50 feet from the edge of Route 72 upon which the deceased had been driving. Watson was removed from the vehicle and taken to the emergency room of Sycamore General Hospital. There was no indication of skid marks from the tires of Watson's car. The investigating officer was not close enough to Watson at any time to ascertain if there was an odor of alcohol on his breath.

Dr. Ovitz, who examined Watson in the emergency room, noticed the odor of alcohol on Watson's breath. Watson denied he had been drinking when queried by the doctor on this point. Dr. Ovitz saw Watson in the emergency room at approximately 9:30 P.M. Watson died the same evening some time between 11:00 and 11:30 P.M.

There was testimony that Watson stopped at the taverns of the defendants after leaving work at approximately 4:00 P.M. The testimony as to the approximate time he was in each establishment and the length of his stay is nebulous, contradictory and for the most part self-serving.

Plaintiff's witness Harold, an acquaintance of Watson's, placed Watson in Fischbach's tavern, located in Genoa, around 4:30 P.M. Watson stayed fifteen or twenty minutes, had one beer, and left at the same time Harold left. Watson showed no signs of intoxication.

Watson then went to the Clover Leaf Tap in Genoa, between 5:05 and 5:15 P.M. where he had another beer. Continuing, he proceeded to the Uptown Tavern in Genoa where he had one or two beers. A partner in the business, Frank DiMario, placed Watson in the tavern around 5:20 P.M. He then went to Kingston, Illinois. In Kingston, Watson went to Johnson's Tavern where he had a beer and a fish fry consisting of fried fish, french fried potatoes, and cole slaw. Next, Watson went to the Corner Tap in Kingston. Doak, a partner in the establishment, testified Watson came in very close to 5:00 P.M. and had two beers which he drank quickly. Watson received a phone call while he was there.

Mrs. Watson testified that she talked by telephone to her husband at the Corner Tap some time between 7:00 and 7:30 P.M. The trial court excluded her opinion as to whether or not her husband was intoxicated.

Plaintiff's most serious allegation of error is that the trial court improperly excluded evidence of the results of a post-mortem analysis of the blood of the deceased for alcohol content on the basis of a proper lack of foundation. Reliance is placed upon *Woolley v. Hafner's Wagon Wheel, Inc.* (1961), 22 Ill.2d 413.

In *Woolley*, a dram shop case, an employee of a pathologist's laboratory group took a blood sample from the deceased on the night of the occurrence at a Moline hospital; labeled it; made an entry in a night record book and placed it in a hospital refrigerator. The following day, one of two employees of the medical group picked up the same and took it to the groups' laboratory to be analyzed. Evidence showed that entries made in the records kept by the medical group were normally taken from the information contained on the labels of the bottles with the specimens in them. There was evidence there had never been a single case of loss, misplacing, mislabeling, or tampering with a blood sample. All available records of the laboratory were placed in evidence and every person having knowledge of material matters about the sample testified.

The court held the results of the analysis admissible on the basis that it had been shown by a preponderance of the evidence and by the highest degree of proof available that the blood sample analyzed was taken from the decedent and was in an unchanged condition when analyzed.

Here, Dr. Ovitz, who treated Watson in the emergency room, was called back to the hospital between 11:30 and 11:40 P.M. He went to the deceased's hospital room. In the presence of a deputy coroner, whose name he did not know, he took a blood sample from the heart of the deceased and placed it in a vial furnished by the deputy coroner. The doctor denied that he took the blood sample in the emergency room. He was certain he only took one sample.

Plaintiff made an offer of proof out of the presence of the jury of the testimony of witnesses Miller and Fioresi which the court rejected:

Miller, a deputy coroner at the time of the accident, went to the hospital after being informed of the death. He took with him a blood tube furnished by the Illinois State Toxicology Laboratory. As far as he knew, the tube had not been opened. At the hospital, Miller gave the vial to a doctor in the emergency room whose name he did not know. He watched as the doctor drew blood from a corpse and put it in the tube. Miller ascertained the name of the deceased as William Watson from a wallet lying next to the body; labeled the specimen by filling out an enclosure form; and placed it in a mailing container. In labeling the specimen, Miller noted the blood was drawn at 11:59 P.M. He took the sealed container home with him and mailed it the following morning to the Illinois State Toxicology laboratory. Plaintiff's Exhibit No. 8 was identified as a "Copy" of the enclosure form placed in the mailing container. Miller was certain only one sample was taken.

Dr. Fioresi, Chief of the Bureau of Toxicology of the State of Illinois and Director of the State Toxicology Laboratory testified as to the normal operating procedures of the laboratory with regard to the receipt of

specimens for analysis through the mail and their handling in the laboratory after receipt. Fioresi stated that the laboratory had received a request from the office of the Coroner of DeKalb County for a blood alcohol analysis and a gastric analysis of specimens taken from the body of the deceased, William Watson. A gastric analysis is an analysis of a specimen of the contents of the stomach and contains no blood. Fioresi identified Plaintiff's Exhibit No. 8 as a "Copy" of the enclosure form received with a blood sample labeled as that of William Watson. There is some question from his testimony whether the gastric specimen and blood specimen were received together in one container.

We agree that there was insufficient foundation. There is a direct contradiction between the testimony of Dr. Ovitz and Miller as to where the blood sample was taken. Even if we dismiss this as a minor discrepancy due to a lapse of years, and going to the weight to be accorded the test and not its admissibility, a reading of the record leaves doubt as to whether the gastric specimen was received along with the blood specimen. Both Miller and Ovitz were positive only a blood sample was taken. Miller was positive he only mailed a blood sample to the Toxicology Laboratory. If the blood and gastric specimens were received together by the laboratory, as alleged by the defendants, Miller's testimony must be completely discounted and there is no chain of evidence linking the blood sample analyzed to the blood sample taken from the deceased. A close reading of the record discloses considerable doubt as to whose sample was examined.

No reliance can be placed on Plaintiff's Exhibit No. 8, a copy of the enclosure form, to meet plaintiff's burden of proof since it is referred to as a "copy" and there is no evidence or testimony as to its source. In *Woolley,* the plaintiff made use of all available records of the laboratory and presented the testimony of all relevant witnesses. In the case at bar, the plaintiff failed to clarify the question of the receipt of the two samples in one container; failed to explain an existence of a copy of the enclosure form; failed to show that all available records with regard to the sample had been introduced; and further failed to prove that the customary routines and procedures in the State Toxicology Laboratory are processes commonly accepted by the medical profession, a requirement of *Woolley.*

■■ Under the circumstances there was insufficient proof that the blood sample in question was from the body of the deceased. We further note that the offer was insufficient in its failure to relate the results of the test to intoxication. The offer was properly refused.

■■■ Plaintiff also alleges that evidence of plaintiff's subsequent remarriage and repeated reference to plaintiff's new marital status during

the *voir dire* prejudiced the jury's consideration of her claim. She argues that the defendants' counsel improperly asked prospective jurors if they were acquainted with plaintiff's new husband. On *voir dire*, an attorney has the right to make such reasonable inquiry as will intelligently permit him to exercise his right of peremptory challenge. (*City of Quincy v. Best Supply Co.* (1959), 17 Ill.2d 570.) In a case such as this, whether a juror was acquainted with the plaintiff's present spouse and could thereby be biased, is within the proper scope of inquiry on *voir dire*. The importance of permitting sufficient inquiry to uncover bias or prejudice is particularly meaningful in dram shop cases. *Schneider v. Kirk* (1967), 83 Ill.App.2d 170.

■■ Plaintiff also contends that counsel for defendant Johnson was improperly allowed to cross-examine the plaintiff, over objection, concerning whether she is now referred to as Mrs. Watson or Mrs. Hughes; whether she now has another child; and whether she is now living at the same address as she lived with the deceased. The cross-examination went beyond the scope of the direct examination. Moreover, to allow testimony concerning the subsequent marriage of a plaintiff in a dram shop action for loss of support is error since the fact that a wife has means or income from a source other than her husband does not affect her right to recover damages under the Dram Shop Act. (*Deel v. Heiligenstein* (1910), 244 Ill. 239, 242; *Hudson v. Leverenz* (1956), 9 Ill.App.2d 96, 106.) However, the jury did not reach the damage issue here and we find no reversible error.

Plaintiff's final contention is that, solely on the basis of a telephone conversation with her husband, she was competent to testify that in her opinion her husband was intoxicated at the time of the phone conversation.

■■ A non-expert witness may testify as to his opinion, based on experience and observation, whether or not a person was intoxicated. (*Suppe v. Sako* (1941), 311 Ill.App. 459, 466.) The fact of intoxication may be ascertained by observation. (*Grant v. Paluch* (1965), 61 Ill.App.2d 247.) It is not sufficient that the witness had merely talked to a person on the telephone and reached conclusions from the response as here. The trial court was correct in excluding the opinion of the plaintiff.

■■ There was no competent evidence that the deceased was intoxicated. The evidence in the light most favorable to the plaintiff shows merely that the deceased had been drinking.

Even if the plaintiff had shown the deceased to be intoxicated, the jury could have based its verdict on a finding that the intoxication was not the proximate cause of the accident. Sally Tester testified that she

turned east onto Route 72, a two lane paved highway with a sixty-five mile per hour speed limit, after seeing the lights of Watson's car at what she thought was about a mile west on Route 72. There was still enough light so that her visibility was about a mile. Miss Tester stated also that she was not too good at judging distances and that she was not sure if her headlights were turned on. After traveling about fifty feet on Route 72 and accelerating to a speed of twenty to twenty-five miles per hour, she saw Watson's car go spinning by her vehicle out of control and crash into the utility pole. She testified the Watson car was going "fast". The sudden appearance of a slow moving vehicle in the deceptive light of dusk could have accounted for the loss of control of the auto by Watson in the minds of the jury.

The judgment below is affirmed.

Judgment affirmed.

ABRAHAMSON and T. MORAN, JJ., concur.